<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES, | : | |
| Plaintiff, | : | Criminal Action No.  02-0933 (JAG) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| ROGER DURONIO, | : | |
| | : | |
| Defendant. | : | |

<u>**GREENAWAY, JR., U.S.D.J.**</u>

## I.  <u>INTRODUCTION</u>

This matter comes before this Court on Defendant Roger Duronio's motion for a new

trial, pursuant to FED. R. CRIM. P. 33.  On July 19, 2006, after a six-week trial, Defendant was

convicted of one count of securities fraud, and one count of computer fraud.  Asserting that the

record demonstrates substantial evidence of prosecutorial misconduct, violations of the rules of

discovery, and other violations of the federal criminal rules, Defendant has moved for a new trial.

For the following reasons, this Court denies Defendant's motion.

## II.  <u>ANALYSIS</u>

### A.    <u>Legal Standard Governing Motions For A New Trial</u>

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if

the interest of justice so requires."  FED. R. CRIM. P. 33(a).  "A high standard is utilized in the

determination of whether a new trial should be ordered 'in the interest of justice' under Rule

1

33(a)."  United States v. Armstrong, No. 02: 04CR313-02, 2006 WL 1835828, at *2 (W.D. Pa.

June 29, 2006) (citing FED. R. CRIM. P. 33(a)).  The Third Circuit has instructed that a new trial

should be granted only if "there is a serious danger that a miscarriage of justice has occurred –

that is an innocent person has been convicted."  United States v. Johnson, 302 F.3d 139, 150 (3d

Cir. 2002) (quoting United States v. Santos, 20 F.3d 280, 285 (7th Cir. 1994) and United States

v. Morales, 902 F.2d 604, 606 (7th Cir. 1990)).  See also United States v. Tarango, 396 F.3d 666,

671 (5th Cir. 2005) ("This power should be exercised infrequently by district courts, unless

warranted by 'exceptional circumstances'").  "Unlike an insufficiency of the evidence claim,

when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the

Government, but instead exercises its own judgment in assessing the Government's case."

Johnson, 302 F.3d at 150 (citing United States v. Lacey, 219 F.3d 779, 783-84 (8th Cir. 2000);

United States v. Ashworth, 836 F.2d 260, 266 (6th Cir. 1988)).

### B.    The Government Did Not Engage In Misconduct During Its Summation

Defendant argues that he is entitled to a new trial because of the Government's

misconduct during its summation.  Defendant specifically contends that the Government (1)

launched personal attacks on defense counsel during its summation; and (2) made comments that

improperly sought to shift the burden of proof to Defendant.  The Government counters that it

did not engage in personal attacks of defense counsel, but rather properly criticized defense

counsel's tactics, arguments, and theories.  The Government further argues that it did not shift

the burden of proof to the defense.

In reviewing the statements underlying Defendant's claim of prosecutorial misconduct,

this Court must be mindful of the Supreme Court's admonition that "a criminal conviction is not

to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." United States v. Young, 470 F.3d 190, 210 (3d Cir. 2005) (quoting United States v. Young, 470 U.S. 1, 11 (1985)).  For the following reasons, this Court finds that the Government, during its summation, did not engage in any misconduct warranting a new trial.

### 1. *The Government Did Not Engage In Personal Attacks Of Defense Counsel*

"Though personal attacks on the character of defense counsel in some instances can rise to the level of misconduct, . . . remark[s] [ ] regarding defense tactics fall far short of that level." Lore, 430 F.3d at 213 (citing United States v. Millar, 79 F.3d 338, 343-44 (2d Cir. 1996) (holding that prosecution's reference to defense as "hog wash" and a "smoke screen" did not warrant new trial); United States v. Santiago, 46 F.3d 885, 892 (9th Cir. 1995) (holding that there was no error in permitting prosecution comments that the defense was devaluing the victim and "dirtying up" witnesses); United States v. Hartmann, 958 F.2d 774, 785 (7th Cir. 1992) (holding that there was no error in allowing the prosecution to remark that the defense told a "whopper" and tried to mislead the jury)); cf. United States v. Friedman, 909 F.2d 705, 709 (2d Cir. 1990) (holding that it was plainly improper for prosecutor to remark, "[w]hile some people . . . prosecute drug dealers and try to see them brought to justice, there are others who defend them, try to get them off, perhaps even for high fees").  "[T]here is a distinction between comments directed at the tactics and arguments advanced by defense counsel and those aimed at the character of the attorneys themselves, with nothing inherently improper about the former." Lore,

430 F.3d at 214 (adopting Hartmann, 958 F.2d at 785).

In support of his argument that the Government personally attacked defense counsel,

Defendant emphasizes that the Government referenced defense counsel as "Mr. Adams" over 64

times during its summation.  Simply mentioning defense counsel by name cannot amount to a

personal attack on Defense counsel.

Defendant also points to the following language from the Government's summation:

> Ladies and gentlemen, I'm going to talk to you in detail about all of these events, but keep these [sic] in mind.  These are from the beacons of light in this case.  Beacons of light that help you and guide you through the course of Mr. Adams' closing argument.
>
> One of the reasons why Mr. Adams brought up during the course of his opening statement, and peppered throughout the course of the cross-examination, was this idea that other people did it, a giant conspiracy.
>
> Do you recall who they were?  First it started out as hackers.  Then the dreaded John Tan, a/k/a Karl Kasper.  Hackers are bad people.  Hackers are awful.  Hackers steal your lunch money.  Do you remember all that?  They're the worst kind of people, hackers.  There's that whole discussion.
>
> Then it turns into Charles Richards did it, and, meanwhile, when you think about it, it can't be a hacker and Charles, this guy who worked there.
>
> The worst thing that Charles Richards ever did in this case, he was friends with Roger Duronio.  That's the evidence.  But given all that – and there's other things you've heard, Sysco.  The dreaded Sysco, the company who came in to do the penetration test.  Then it was the, well, maybe it was that man right there.  Special Agent Greg O'Neil, he did it.  He did it in conjunction with John Tan, UBS, other parts of the Government.  It goes on.

(Transcript Of Trial Proceedings ("Trial Tr."), Vol. 18, at 2339.)  This excerpt amounts to an

attack on the defense strategy of deflecting blame onto individuals other than Defendant.

Contrary to Defendant's arguments, the Government in no way personally attacked defense

counsel through these statements.  These statements do not reflect Government misconduct, and

did not affect the fairness of the trial.  This Court will not grant Defendant's motion for a new

trial based on these statements.

Defendant also points to the Government's argument that the jury should not believe defense counsel because of his method of attacking adverse witnesses on cross-examination. (Id. at 2347-2350.) The Government argued that "Mr. Adams' tactic is to attack . . . that's not the first time, nor in this trial is it going to be the last time, that Mr. Adams does that." (Id. at 2349:4-2350:1.) Immediately after this statement, the Government clarified that it was "not attacking Mr. Adams personally," but "challenging the tactic[s]" employed by defense counsel when cross-examining witnesses. (Id. at 2350.) The Government's criticism of the way in which defense counsel conducted cross-examination does not amount to a personal attack on Mr. Adams, and cannot serve as a basis for granting a new trial. See, e.g., Lore, 430 F.3d at 213 (rhetorical question during rebuttal summation asking whether the cross-examination of G'Sell was 'disingenuous' or 'clever lawyering'" did not amount to prosecutorial misconduct warranting a new trial).

Defendant also points to the following statements made by the Government in its summation:

> In another area regarding the subject matter, Mr. Adams does another slight of hand. He says, well, Mr. Kahn, you would agree with me that, look, this is really an affordable way to buy puts. B[u]y them cheap.
> That's laughable . . .
> And if you're thinking for a moment that's a viable strategy, let me tell you, I got a bridge I can sell you affordable. There's no way that makes any sense, but Mr. Adams tried to sell that to you.

(Trial Tr., Vol. 18, at 2381:23-2382:8.) Through these words, the Government did not attack defense counsel personally, but argued that defense counsel's arguments were "laughable," i.e., not viable. These statements do not amount to prosecutorial misconduct, and do not warrant a new trial. See, e.g., Lore, 430 F.3d at 213; Millar, 79 F.3d at 343-44; Hartmann, 958 F.2d at 785.

Defendant further contends that the Government made an *ad hominem* attack on defense counsel when it stated, "Mr. Adams favorite television program is CSI, Law & Order. They always get fingerprints, good forensic evidence. Guess what? That isn't real life. That is not real life." (Trial Tr., Vol. 18, at 2383:11-14.) This statement was made in the context of the Government trying to explain that it was inconsequential that there was no evidence that Defendant's fingerprints had been found on the computer. In short, this statement was an attack on defense counsel's tactical insinuation that without evidence of fingerprints, Defendant could not be found guilty beyond a reasonable doubt. Thus, this statement was an attack on defense tactics, and not a personal attack on defense counsel. It does not amount to prosecutorial misconduct.

Defendant last argues that the Government personally attacked defense counsel when it stated, "Mr. Adams made some points in this case. Some of them fair. Many unfair, but some fair." (Trial Tr., Vol. 18, at 2393:11-12.) Contrary to Defendant's contentions, this statement does not attack Mr. Adams himself or suggest that Mr. Adams is an "unfair" person. Rather, the statement attacks the arguments defense counsel made on his client's behalf. Accordingly, it does not amount to prosecutorial misconduct.

In sum, the excerpts cited by Defendant fail to demonstrate that the Government personally attacked defense counsel during its summation.[1] This Court's review of the transcript

---

[1]In his reply, Defendant identifies an additional excerpt, which he claims constitutes a personal attack on defense counsel. (Def.'s Reply at 3-4.) "It is improper for the moving party to 'shift gears' and introduce new facts or different legal arguments in the reply brief than [those that were] presented in the moving papers." William W. Schwarzer, A. Wallace Tashima, and James M. Wagstaffe, FEDERAL CIVIL PROCEDURE BEFORE TRIAL, § 12:107 (The Rutter Group

2005); see Burnham v. City of Rohnert Park, No. C 92-1439, 1992 WL 672965, at * 5 (N.D. Cal. May 18, 1992) ("[R]eply briefs are limited in scope to matters either raised by the opposition or unforeseen at the time of the original motion"); Scott v. R.J. Reynolds Tobacco Co., No. Civ.A. 99-3091, 2001 WL 797992, at * 5 (E.D. La. July 12, 2001) (same). For this reason, this Court has discretion to decline to consider new facts or arguments raised in a reply. See Stump v. Gates, 211 F.3d 527, 533 (10th Cir. 2000) ("This court does not ordinarily review issues raised for the first time in a reply brief. . . . The reasons are obvious. It robs the appellee of the opportunity to demonstrate that the record does not support an appellant's factual assertions and to present an analysis of the pertinent legal precedent that may compel a contrary result"). See, e.g., Halliburton Energy Services, Inc. v. Weatherford International, Inc., No. Civ.A. 302CV1347-N, 2003 WL 22017187, at * 1 n.1 (N.D. Tex. Aug. 26, 2003) ("Halliburton offers additional grounds for reconsideration in its reply[;] however, the grounds are not proper under Rule 59(e), . . . and the Court will not consider an argument raised for the first time in a reply brief"); Public Citizen Health Research Group v. National Institutes of Health, 209 F. Supp.2d 37, 44 (D.D.C. 2002) ("The Court highly disfavors parties creating new arguments at the reply stage that were not fully briefed during the litigation. . . . By placing a new argument in the Reply, Plaintiff does not permit Defendant or Intervenor-Defendant to competently respond to such an argument"); Grupo Gigante S.A. de C.V. v. Dallo & Co., Inc., 119 F. Supp.2d 1083, 1103 n. 15 (C.D. Cal. 2000) ("Although the defendants raised a laches defense in their opposition to the plaintiffs' motion for summary judgment, the first time they raised a statute of limitations defense was in their reply brief. The Court need not, and does not, consider arguments raised for the first time in a reply brief"), vacated and remanded on other grounds, 391 F.3d 1088 (9th Cir. 2004).

Because the Government has been denied an opportunity to respond to the newly-identified purported personal attack on defense counsel, this Court need not consider it in ruling on the pending motion for a new trial. Nonetheless, even if this Court were to consider the newly identified excerpt, it still could not find that the Government personally attacked defense counsel. In the identified excerpt, the Government argued,

Do you recall how many hundreds of people were working on this problem? All the system administrators, then it got to be 100 by eleven o'clock, then it got to be over 300 people working on this problem, ladies and gentlemen. Does that sound to you like an unsophisticated hacker, like a prank, as Mr. Adams told you in his opening statement?

That's absurd, right? It's nonsense.

He also threw in the word sophomoric prank, right? You know what a sophomoric is, toilet paper on a tree. That's a sophomoric prank. Soap on a window, that's a prank. Eggs at your house, that's a prank. And I know nothing about these things, by the way. But that is the sophomoric prank.

The logic bomb, the way it was constructed, designed, what you had to know, is not a prank. It was convenient for Mr. Adams. Fiction, like CSI.

(Trial Tr., Vol. 18, at 2361:11-25.)

This argument does not personally attack defense counsel, but rather attacks the

demonstrates that the comments cited by Defendant are directed at the tactics and arguments advanced by defense counsel, rather than aimed at the character of Mr. Adams, himself.  As this Court has noted, there is nothing inherently improper about criticizing defense tactics.  <u>Lore</u>, 430 F.3d at 214.  Accordingly, Defendant's motion for a new trial on the ground that the Government engaged in personal attacks on defense counsel is denied.

### 2. *The Government Did Not Shift The Burden Of Proof To The Defense*

Defendant also argues that the Government engaged in prosecutorial misconduct during its summation by shifting the burden of proof to the Defendant.  "[T]he prosecution may not comment on a defendant's failure to testify and may not improperly suggest that the defendant has the burden to produce evidence."  <u>United States v. Balter</u>, 91 F.3d 427, 441 (3d Cir. 1996) (citing <u>United States v. Parker</u>, 903 F.2d 91, 98 (2d Cir. 1990); <u>United States v. Drake</u>, 885 F.2d 323 (6th Cir. 1989)).  There is, however, "nothing improper about a prosecutor 'attempt[ing] to focus the jury's attention on holes in the defense's theory.'"  <u>Lore</u>, 430 F.3d at 213 (quoting <u>Balter</u>, 91 F.3d at 441).  "Such a comment does not implicate any of the burden-shifting concerns that are raised when a prosecutor points to a defendant's failure to testify or improperly suggests that the defendant has the burden of producing evidence."  <u>Id.</u>

First, Defendant points to the Government's statement that:

> There's no dispute, I ask you, that it cost UBS in excess of $3.1 million, this recovery.  The woman who testified, it was Nancy Bagli, was very quiet, very small, testified about that.  And Mr. Adams stood up when her direct examination was completed, he stood up and said, I have no questions.  Uncontested.

---

arguments defense counsel made on his client's behalf.  Accordingly, it does not amount to prosecutorial misconduct.  Therefore, to the extent Defendant relies on this excerpt, his motion for a new trial is denied.

(Trial Tr., Vol. 18, at 2363:6-11.)  Through this statement, the Government did not argue that the Defendant had any burden to present contradictory evidence to establish his innocence.  Rather, the Government emphasized that its evidence clearly demonstrated that it cost UBS more than $3.1 million to recover its losses beyond a reasonable doubt, particularly in the absence of any contradictory evidence.  Defendant's motion is therefore denied, to the extent it relies on this statement.

Defendant next points to the Government's argument regarding whether a logic bomb caused the outage:

Ladies and gentlemen, I submit to you – now, Mr. Adams throws out there, well, you know, you had a branch server down seven in the morning.  It could have been eight o'clock that morning.

He's right in the sense that somebody complained.  Where I differ with the representations of counsel is that exhibit I think its Government Exhibit 117.  You heard the testimony of the people who were actually on the ground trying to fix the problem.  And did you ever hear one time from any of those witnesses an acknowledgment that, hey, look it was a logic bomb that did it?  No, all you heard from them is, look, I see MRM.  It wasn't until later on they said, look, I think it's a logic bomb.

So how is it possible that some individual sitting in an office taking phone calls from complaining branches that they know it's a virus or anything else?  How would they know that?  But Mr. Adams in cross-examination, witness after witness after witness, showed that Exhibit 117.  I got around and said, look, there is evidence there was a virus that happened at seven this morning.

Nonsense.  Come on.  Do you think UBS is mistakenly going to figure out, you know, when we say it happened at 9:30, and thousands of computers all over the country, all of this happened, you think they got the time wrong?  You think they confused something that happened at seven o'clock with something that happened at 9:30 that devastated this company?  Give them a little bit of credit, right?  They're not crazy, right?  They're paying attention and they know.

So Mr. Adams is correct in saying somebody was complaining.  He overstates his position when he says it was a virus and relies upon it.  Because if he's going to rely upon that, then he should reply upon other records, right?  He doesn't.

It's convenient for him to select, to choose something that he feels favorable to the defendant and ignore and bypass all the other mountains of

> evidence about the logic bomb going off at 9:30.  In fact, on cross-examination of
> every witness didn't you ever hear any of them say, hey, you're right, when I
> thought it was 9:30, it was actually 7:30 in the morning?  Did not happen in this
> case.

(Trial Tr., Vol. 18, at 2363:17-2365:6.)  Defendant focuses on the Government's rhetorical

question, "Because if he's going to rely upon that, then he should reply upon other records,

right?," and contends that this statement serves as an argument that the Defendant had some

obligation to address certain evidence or produce some defense.  (Def.'s Br. at 6.)  This Court

cannot agree.  The Government's argument is a clear example of "attempt[ing] to focus the jury's

attention on holes in the defense's theory'" that the damage to the UBS computer system was

caused by a virus.  See Lore, 430 F.3d at 213 (quoting Balter, 91 F.3d at 441).  The Government

did not shift the burden of proof with its argument, and therefore Defendant's motion is denied to

the extent it relies on the above-cited language.

     Defendant also points to the following argument by the Government:

> It isn't merely, well, you know, anybody could have gone in and taken care of it
> and done it from a workstation.  See, Mr. Adams is suggesting at his closing this
> is an inside job.  I would suggest to you, ladies and gentlemen, the fact Mr. Adams
> did, midway during this trial at some point, he went from it was a hacker theory to
> [ ][R]ichards.  You had to have access to the workstation at UBS.  And, finally,
> ladies and gentlemen, and most important fact, or one of the most important facts,
> is you had to have access to Roger's home.  You had to be in his house to do this.

(Trial Tr., Vol. 18, at 2368:18-2369:2.)  Defendant argues that this statement called upon the jury

to demand that defense counsel offer an explanation as to why evidence was found in a certain

location.  This Court cannot agree with Defendant's interpretation of this excerpt of the

Government's summation.  As with the other excerpts addressed in this opinion, the

Government's statement amounts to an attempt to poke holes in the Defense's theory of the case,

i.e., that a hacker or Mr. Richards, rather than Defendant, could have perpetrated the charged crimes.  Accordingly, to the extent Defendant relies on the above language, his motion for a new trial is denied.  See Lore, 430 F.3d at 213.

Defendant also cites the Government's statement that "[t]his damaging piece of evidence is found, however, inside of Roger Duronio's bedroom.  So the only thing that Mr. Adams can do is attack the messenger."  (Trial Tr., Vol. 18, at 2383:19-21.)  Defendant contends that this statement suggested to the jury that Defendant had an obligation to put forth a defense.  This Court cannot agree.  Rather, this statement serves to attack defense counsel's theory that someone else was involved.  As a statement focusing the jury's attention on holes in the defense's theory in light of the evidence presented at trial, the Government's argument does not implicate any burden-shifting concerns.  Lore, 430 F.3d at 213.  To the extent the Defendant relies on this statement by the Government, his motion for a new trial is denied.

In sum, contrary to Defendant's arguments, the content of the Government's summation did not shift the burden of proof to Defendant on any element of the charges against him.[2]

---

[2]In his reply, Defendant identifies an additional excerpt, which he claims constitutes prosecutorial misconduct.  (Def.'s Reply at 5-6.)  As this Court has explained, "[i]t is improper for the moving party to 'shift gears' and introduce new facts or different legal arguments in the reply brief than [those that were] presented in the moving papers."  Schwarzer, Tashima, and Wagstaffe, FEDERAL CIVIL PROCEDURE BEFORE TRIAL, § 12:107; see Gambra, 377 F. Supp.2d at 827, n.18; Burnham, 1992 WL 672965, at * 5; Scott, 2001 WL 797992, at * 5.  For this reason, this Court has discretion to decline to consider new facts or arguments raised in a reply.  See Stump, 211 F.3d at 533; Stewart, 2004 WL 2980783, at * 11; Halliburton, 2003 WL 22017187, at * 1 n.1; Dietrich, 297 F. Supp.2d at 1128.  Because the Government has been denied an opportunity to respond to the newly identified instance of purported prosecutorial misconduct, this Court need not, and shall not, consider it in ruling on the pending motion for a new trial.

Nonetheless, even if this Court were to consider the newly identified line of questioning, it still could not find that the Government improperly shifted the burden of proof to Defendant.  In the identified excerpt, the Government asked a defense expert if he was aware that another computer forensic expert was retained by the defense.  (Trial Tr., Vol 16, at 2183:18-

Defendant's motion for a new trial on the ground that the Government engaged in prosecutorial misconduct vis-a-vis statements made during its summation is denied.

**C.      The Court Exercised Proper Discretion In Proceeding With 11 Jurors**

Defendant also contends that he is entitled to a new trial because this Court permitted the jury to deliberate with eleven jurors despite the availability of alternates.  (Def.'s Br. at 8-9.) FED. R. CRIM. P. 23(b) provides that "[a]fter the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror."  Id.  According to FED. R. CRIM. P. 24(c), this Court has the discretion to dismiss or "retain alternate jurors after the jury retires to deliberate."  Id.  As the Advisory Committee Notes state, "the court should have the discretion to decide whether to retain or discharge alternates at the time the jury retires to deliberate and to use Rule 23(b) to proceed with eleven jurors or to substitute a juror or jurors with alternate jurors who have been discharged."  FED. R. CRIM. P. 24, Advisory Committee's Notes.

The Third Circuit has expressly held that trial judges should allow eleven-juror verdicts under Rule 23(b) rather than substitute alternate jurors, where one juror must be dismissed for cause after deliberations have begun.  United States v. Gambino, 788 F.2d 938, 948-49 (3d Cir. 1986), cert. denied, 479 U.S. 825 (1986).  "The virtues of the 11-juror verdict allowed by Rule 23(b) are that it eliminates the risk of prejudice that arises whenever an alternate juror is recalled

---

2184:1.)  This line of questioning does not suggest that the Defendant had a burden to put the other expert on the stand.  Rather, it serves to poke holes in the Defendant's theory of the case. Through this line of questioning, the Government challenged the credibility of the Defendant's witness's testimony by drawing out information suggesting that another expert had made contrary findings.  Accordingly, to the extent Defendant relies on the line of questioning cited in his reply brief, his motion for a new trial is denied.  See Lore, 430 F.3d at 213.

and does not require the agreement of the parties." <u>United States v. Huntress</u>, 956 F.2d 1309, 1317 (5th Cir. 1992).

Defendant does not contest that the twelfth juror was dismissed from the jury for good cause. Nor does he dispute this Court's authority to order that deliberations proceed with eleven jurors. Defendant instead argues that this Court's decision to dismiss the alternate jurors, after deliberations had begun, prejudiced Defendant and warrants a new trial. Defendant does not explain how he was prejudiced by an eleven-person verdict, nor does he direct this Court to any authority supporting a new trial on such grounds.

This Court cannot agree that its decision to dismiss the alternate jurors, pursuant to its authority under Rule 24(c), provides the basis for a new trial, or in any way prejudiced Defendant. <u>Cf.</u> <u>Huntress</u>, 956 F.2d 1309, 1317 (5th Cir. 1992) ("the 11-juror verdict allowed by Rule 23(b) are that it *eliminates the risk of prejudice* that arises whenever an alternate juror is recalled") (emphasis added); <u>Coates v. Lawrence</u>, 131 F.2d 110, 111 (5th Cir. 1942) (where trial proceeded before remaining eleven jurors, accused was not entitled to release on habeas corpus on ground that he was denied right to trial by jury). Even had the alternates remained available at the time the twelfth juror was excused from the panel,[3] this Court was still within its discretion to permit the eleven-person jury to deliberate and return a verdict. FED. R. CRIM. P. 23(b). Defendant's motion for a new trial on the ground that the jury proceeded to a verdict with only eleven members is denied.

---

[3]This Court retained the alternate jurors for two days after deliberations had begun. Indeed, one of the final deliberating jurors was an alternate juror, who joined the jury after a full day of deliberations.

13

**D.      Juror Number 11 Did Not Have A Prejudicial Connection To Verizon**

Defendant argues that he is entitled to a new trial because Juror Number 11 had a prejudicial connection to Verizon, i.e., she was a former Verizon employee.  The Government counters that Defendant's belated challenge to Juror Number 11 was waived when Defendant, knowing that Juror Number 11 previously had been employed by Verizon, chose not to dismiss her with a peremptory challenge and proclaimed to the Court that the jury was satisfactory.  This Court finds that regardless of whether Defendant waived his right to challenge Juror Number 11, Juror Number 11 did not have a prejudicial connection to Verizon.

Under the Jury Selection and Service Act, a potential juror may be excused or excluded from a panel only on certain enumerated grounds.  See 28 U.S.C. §§ 1861-78 (1988).   The only possible grounds for acquaintance-based exclusions are found at 28 U.S.C. § 1866(c)(2), which provides that a juror may be "excluded by the court on the ground that such person may be unable to render impartial jury service or that his service as a potential juror would be likely to disrupt the proceedings," and at § 1866(c)(4), which provides that a juror may be "excluded pursuant to the procedure specified by law upon a challenge by any party for good cause shown." For the purposes of reviewing the exclusion of a juror on the grounds of probable bias, "good cause shown" means the same thing as "unable to render impartial jury service."  United States v. Calabrese, 942 F.2d 218, 222 (3d Cir. 1991).  The district court has discretion to determine whether a juror is unable to render impartial jury service because of his or her associations.  Id.; United States v. Salamone, 800 F.2d 1216, 1227 (3d Cir. 1986); Government of Virgin Islands v. Gereau, 502 F.2d 914, 934 (3d Cir. 1974).

As this Court found during voir dire, the record is devoid of any reliable indication that

14

Juror Number 11's deliberations would be or were in fact biased.  During voir dire, Juror Number 11 unequivocally stated that, while she had been employed by Verizon for 30 years as a sales and service consultant,[4] there is nothing about her tenure at Verizon or her feelings about the company, which would make her less than fair and impartial in listening to a witness from Verizon and determining the credibility of that witness.  (Jury Selection (Excerpt) Transcript ("Voir Dire Tr."), May 24, 2006, at 7:2-8:1.)  As this Court found at the time, because (1) the witness from Verizon, who testified at trial was not a fact witness, but rather merely a custodian of records; (2) Juror Number 11's connection to Verizon was extremely attenuated, given that she no longer worked for the company, and was not then recieving any monetary benefits from the company; and (3) Juror Number 11 clearly explained to this Court that her prior relationship with Verizon would not affect her impartiality, there was no basis for a finding of bias, such that Juror Number 11 should have been excluded from the jury for cause.  (See Voir Dire Tr. at 9:12-21.) Defendant's motion for a new trial on the basis of Juror Number 11's connection to Verizon is denied.

### E.   The Government Did Not Violate Rule 16 Or Engage In A Brady Violation

Defendant also contends that he is entitled to a new trial because the Government failed to comply with its Fed. R. Crim. P. 16 and Brady discovery obligations.  This argument was raised by Defendant through various motions and arguments both before and during the trial on this matter, and the issue has been addressed by this Court at length through extensive oral argument, and two separate orders.  (See Docket Nos. 72, 110.)  The testimony cited by

---

[4]At the time of trial, Juror Number 11 had not worked for Verizon for almost five years, and was not receiving any monetary benefits from the company, with the exception of health care benefits.

Defendant in his brief does not alter this Court's earlier findings.  This Court now reaffirms its prior holding that the actions of third party UBS/@stake cannot be imputed to the Government and no <u>Brady</u> violation has occurred.  Defendant's motion for a new trial on such grounds is denied.

### F.   The Government's Purported Violation Of The Jencks Act Does Not Warrant A New Trial

Defendant argues that he is entitled to a new trial because the Government instructed its agents not to take notes in violation of the Jencks Act.  (Def.'s Br. at 16-17.)  The Jencks Act, which is a discovery rule, and not a rule of fairness and minimum prosecutorial obligation (<u>see</u> <u>United States v. Starusko</u>, 729 F.2d 256, 262 (3d Cir. 1984)), provides in pertinent part:

> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.
>
> (c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

18 U.S.C. § 3500(b), (c).

"The Jencks Act does not impose an obligation on Government agents to record witness interviews or to take notes during such interviews.  After all, the Act applies only to recordings, written statements, and notes that meet certain criteria, not to items that never came into being." United States v. Houlihan, 92 F.3d 1271, 1288 (1st Cir. 1996).  See also United States v. Lieberman, 608 F.2d 889, 897 (1st Cir. 1979) (rejecting a claim that the Government has "a duty to create Jencks Act material by recording everything a potential witness says"); United States v. Bernard, 625 F.2d 854, 859-60 (9th Cir. 1980) (the Jencks Act requires prosecution to produce "written statements" of various types or their equivalent; however, the Government is not required to create such discoverable statements in first instance); United States v. Cruz, 478 F.2d 408, 411 (5th Cir. 1973) ("no part of the Jencks Act has ever been construed to require the Government to develop potential Jencks Act statements so that such materials can be combed in the hopes of obtaining impeaching inconsistencies").  The Government does not violate the Jencks Act by instructing agents to minimize note-taking.  Houlihan, 92 F.3d at 1289.

Based on this authority, this Court must conclude that the Government did not violate the Jencks Act by instructing its agents not to take notes during witness interviews related to this matter.  For this reason, Defendant's motion for a new trial based on purported violations of the Jencks Act is denied.

### G.     There Was No Prejudicial Variance

Defendant argues that he is entitled to a new trial because the Government's presentation of evidence at trial amounted to an impermissible variance of the indictment, resulting in prejudice to Defendant.  This Court cannot agree.

17

A variance occurs when "the evidence at the trial proves facts materially different from those alleged in the indictment." United States v. Daraio, 445 F.3d 253, 259 (3d Cir. 2006) (citing United States v. Castro, 776 F.2d 1118, 1121 (3d Cir. 1985)).  The concerns raised by a variance are the fairness of the trial and the protection of the defendant's right to notice of the charges against him and his opportunity to be heard.  Daraio, 445 F.3d at 261 (citing Kotteakos v. United States, 328 U.S. 750, 757-58 (1946); Berger v. United States, 295 U.S. 78, 81-82 (1935)).

"[A] variance can result in a reversible error only if it is likely to have surprised or otherwise has prejudiced the defense." Daraio, 445 F.3d at 262 (citing United States v. Schurr, 775 F.2d 549, 553-54 (3d Cir. 1985)).  The defendant bears the burden of establishing a prejudicial variance by demonstrating that (1) there was a variance between the indictment and the proof adduced at trial; and (2) the variance prejudiced a substantial right of the Defendant. United States v. Balter, 91 F.3d 427, 441 (3d Cir. 1996).  "A variance does not prejudice a defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, [or] (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense." United States v. Schoenhut, 576 F.2d 1010, 1021-22 (3d Cir. 1978).

In this case, the indictment charged Defendant with securities fraud based on his purchase of "put" option contracts.  The superceding indictment lists the "put" option contracts Defendant was alleged to have purchased.  (Superceding Indictment, ¶ 7.)  No mention of "short sales" was made anywhere in this list, or anywhere else in the indictment.

Defendant contends that the Government's submission of "short sales" evidence created a

variance.  Defendant specifically points to the Government's reference to "short sales" of UBS

stock during its questioning of Special Agent Gregory O'Neil.  The challenged exchange went as

follows:

> (Exhibit G-761[, a summary of short sales in the Datek account,] is marked in
> evidence)
> Q       Can you describe for the jury what the summary contains?
> A       Sure.
>           Contains the different days in which the short sell actually took place.
> First, on the 28th, it shows the account opened by Roger Duronio with a $3,000
> deposit.
>           On March 1st, Roger Duronio buys back 100 shares of UBS at $50 to
> compensate the prior transaction of the short sale.
> Q       Did he make a profit or a loss on the transaction?
> A       Down there at the bottom it says the overall result is a net loss of
>           approximately $376.
> Q       Very basic summary, in order for Mr. Duronio to profit from a short sale,
>           at what price?
> A       $46.38.
> Q       What has to happen to the stock price?
> A       The stock has to drop lower than that price.
> Q       In this case, did it?
> A       In this case, it did not.
>           He covered the short sell on the 15th of March, and at the time the stock
> was trading $50.14.

(Trial Tr., Vol. 8, at 1088:10-1089:7.)

Defendant argues that this evidence of "short sales," which were not charged in the indictment,

was presented to the jury as cumulative evidence that Defendant acted in furtherance of a scheme

to defraud.

Defendant further contends that this evidence had an impact on the jury's deliberations,

as demonstrated by the jury's question, marked C-18, which inquired:  "Shall we use as the

definition of "put options" in count one, only the put options or any security?  Specifically the

stocks sold short – ."  Defendant acknowledges that after the jury asked this question, this Court

gave a curative instruction to disregard the "short sales" evidence in reaching a verdict on Court One of the indictment, i.e., the securities fraud count.  Nonetheless, in conclusory fashion, Defendant contends that he was prejudiced by the variance, and that a new trial is warranted.

The Government counters that even if the "short sales" evidence constitutes a variance, its introduction in no way prejudiced Defendant because: (1) Defendant was aware that the Government intended to introduce the "short sales" evidence; (2) Defendant failed to object to the admission of this evidence at trial; and (3) this Court properly issued a curative instruction directing that the jury consider only the "puts," and not the "short sales," in deliberating upon Count One of the indictment.

This Court determines that Defendant has failed to meet his burden of demonstrating that he was prejudiced by the introduction of "short sales" evidence.  As this Court has explained, "[a] variance does not prejudice a defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, [or] (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense."  Schoenhut, 576 F.2d at 1021-22.

Here, even if there was a variance, it does not change the fact that the indictment sufficiently informed the Defendant of the charges against him such that he could prepare his defense and not be misled or surprised at trial.

Moreover, to the extent that any prejudice may be inferred, it was undoubtedly cured by this Court's curative instruction, which clearly informed the jurors that they were not to consider

20

the "short sales" evidence in their determination of Count I.[5]  The jury's question regarding the "short sales" evidence indicates that they were aware of the distinction between the "puts" and "short sales" evidence.  The record further reflects that they sought and ultimately obtained clarification regarding what evidence they should consider in reaching a verdict.  There is every indication, particularly in light of the jury's question, and this Court's curative instruction, that the jury did not consider the "short sales" evidence in reaching their verdict.  The "short sales" evidence, even if it did constitute a variance, did not prejudice Defendant's rights as a result.[6]  A new trial is not warranted by the Government's presentation of "short sales" evidence, and Defendant's motion on this ground is denied.

## H.   The Government Proffered Sufficient Evidence To Support A Guilty Verdict[7]

Defendant argues that he is entitled to a new trial because the Government failed to

---

[5]This Court instructed the jury as follows:
> I have something long and detailed to tell you in response to your question, and the question is:
> Shall we use as the definition of put options in Count One only the put options or any security?  Specifically, the stocks sold short.
> My long answer to you is, put options.
> That's it.  Thank you.

(Jury Deliberations Transcript, July 18, 2006, at 7:9-15.)

[6]Although Defendant does not argue that any variance in the proof presents a danger that the Defendant may be prosecuted a second time for the same offense, this Court finds that the record fails to support such a contention.  Therefore, a new trial is not warranted on such grounds.

[7]Defendant's challenge to the sufficiency of the evidence adduced at trial is not properly brought under FED. R. CRIM. P. 33.  The legal standard governing motions for new trials based on the insufficiency of the evidence proffered at trial are evaluated under a distinct standard, as described herein.

present sufficient evidence to support the return of a guilty verdict.  "Challenges to the sufficiency of the evidence of a criminal conviction are reviewed in the light most favorable to the verdict, crediting every inference that could have been drawn in its favor."  United States v. Williams, 134 Fed. Appx. 510, 514 (3d Cir. May 26, 2005) (citing United States v. Riddick, 156 F.3d 505, 509 (3d Cir. 1998)).  A verdict must be sustained "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998) (quotation omitted).  "In making this determination, this Court does not weigh the evidence or determine the credibility of the witnesses."  Williams, 134 Fed. Appx. at 514.

Defendant was found guilty of the charged offenses of securities fraud and computer fraud.[8]  Defendant specifically argues that there is insufficient evidence to support a conviction on either of these two counts of the indictment because (1) the Government failed to present evidence that a "C" code compiler was found on any of the suspect computers; and (2) the Government was allowed improperly to present system back-up tapes as evidence without a proper foundation.

### 1.    *"C" Code Compiler Evidence*

In support of his first argument, i.e., that the Government failed to present evidence that a "C" code compiler was found on any of the suspect computers, Defendant points to the testimony of Government expert Keith Jones.  Mr. Jones testified that (1) a "C" code compiler is needed to

---

[8]Defendant was found not guilty of the two counts of mail fraud charged in the indictment.

convert a "C" source code to a "C" binary file;[9] and (2) he did not recall if he found a "C" code compiler on the suspect computers.  (Trial Tr., Vol. 14, at 1918-21.)[10]

This Court finds that Mr. Jones' testimony in no way renders the evidence insufficient to support the jury's conviction of Defendant for computer fraud.  Contrary to Defendant's contention, Mr. Jones' testimony does not indicate that no "C" code compiler was found on the suspect computers.  Mr. Jones' testimony was equivocal at best ("I didn't say I didn't find it, I said I don't recall either way"), and irrelevant at worst.  The circumstantial evidence in the record – that logic bomb components were found on the suspect computers – could lead a reasonable juror to conclude that a "C" code compiler did exist such that Duronio committed the charged

---

[9]In other words, a "C" code compiler was necessary to create a logic bomb on the suspect computers, as Duronio was charged with doing.

[10]The pertinent portion of Mr. Jones testimony on cross-examination invoked by Defendant went as follows:

| Q | With the version of the compiler you found existed on Mr. Duronio's computer at the time, could that be compiled? |
| A | I never said I found a compiler on Mr. Duronio's computer. |
| Q | There was no compiler on his computer? |
| A | I never had testimony about any of that, no. |
| . . . | |
| Q | And you didn't find a compiler on the SA.C DEV1, 2 or 3.  Is that correct? |
| A | I didn't say I didn't find it, I said I don't recall either way. |
| Q | Did you look? |
| A | I don't recall looking, no. |
| Q | So as I sit here today, you can't say whether or not that source code could have been compiled on any other servers? |
| A | Define "any other servers." |
| Q | SA.C, DEV1, 2, DEV3. |
| A | It had potential to be compiled on SA and the DEV computers. |
| Q | That would be a guess right? |
| A | No, not a guess, it has potential. |

(Trial Tr., Vol. 14, at 1919:25-1920:25.)

offenses in the absence of affirmative evidence demonstrating the existence of a compiler.  The Government concedes that there can be no logic bomb without a "C" code compiler.  Duronio does not contest that evidence in the record clearly supports the existence of a logic bomb on the suspect computers.  Because a "C" code compiler must exist before a logic bomb can be created, a reasonable juror would have to infer that because a logic bomb existed on the suspect computers, so too did "C" code compilers.

For these reasons, this Court cannot accept Defendant's argument that Mr. Jones' testimony demonstrates a lack of sufficient evidence to support his conviction for computer fraud.  To the extent it relies on Mr. Jones' testimony, Defendant's motion for a new trial based on insufficiency of evidence is denied.

### 2.    *Back-Up Tapes*

Defendant's second argument, i.e., that this Court improperly admitted system back-up tapes as evidence without a proper foundation, is also unavailing.  A witness's status as a custodian is not defeated simply because he had no personal knowledge of the substance of the records at issue.  "A custodian of records is not obliged to possess personal knowledge of the content of the file.  He need only authenticate its source."  United States v. Lavin, 480 F.2d 657, 661 (2d Cir. 1973) (quoting Yates v. United States, 404 F.2d 462, 467 (1st Cir. 1968), cert. denied, 395 U.S. 925 (1969)).  See also  United States v. Kail, 804 F.2d 441, 448 (8th Cir. 1986) ("Foundation under the business record exception to the hearsay rule may be supplied by a custodian of records or 'other qualified witness' who has no personal knowledge regarding the creation of the document").

The back-up tapes, i.e., Exhibits 501 and 520,  were admitted through the testimony of

UBS employee Rajeev Khanna, who effectively testified as a custodian of records.  As this Court

found at trial, there was no basis for this Court to strike the tapes from evidence, notwithstanding

any testimony elicited by Defendant indicating that Mr. Khanna had not personally reviewed all

of the tapes.  Mr. Khanna identified the evidence as tapes from UBS created or produced

pursuant to his direction, and "the fact that he hasn't seen all of the tapes or viewed all of the

tapes does not disqualify him as a custodian of sorts to identify the tapes and provide the

predicate for their admission."  (Trial Tr., Vol. 4, at 517:21-518:8.)[11]  See Lavin, 480 F.2d at 661.

Moreover, Defendant does not explain, and this Court cannot discern, how excluding Exhibits

501 and 520 from evidence would render the evidence against Defendant insufficient to support

his conviction for securities and computer fraud.  To the extent his motion for a new trial is

predicated on his argument that Exhibits 501 and 520 should have been excluded from evidence,

Defendant's motion for a new trial is denied.

 In sum, viewing the evidence in the light most favorable to the verdict, this Court finds

that the Government proffered sufficient evidence to support the jury's decision to convict

Defendant of both securities and computer fraud.  Thus, to the extent he claims insufficiency of

evidence to support the verdict, Defendant's motion for a new trial is denied.

### I. The Government Did Not Use Protected Information At Trial

 Defendant contends that he is entitled to a new trial because, during trial, the Government

used information protected by the work product privilege, in violation of a September 2004 pre-

trial agreement restricting the use of certain documents.  Defendant specifically contends that the

---

[11]Defendant has not argued, and this Court cannot discern any chain of custody issues
regarding the challenged tapes.

Government used protected information when it questioned Defendant's testifying expert about Defendant's retention of a previous expert, who did not testify, in order to debunk the testifying expert's testimony.  Defendant argues that the only way the Government could have known about the previously-retained expert was through privileged communications, which the Government agreed it would not use.

The Government responds that, contrary to Defendant's argument, the Government had gleaned its knowledge that Defendant had retained the non-testifying expert outside of any privileged communications; in 2002, the non-testifying expert participated in at least two proffer meetings with Defendant, his prior counsel, and members of the prosecution team.  (Govt.'s Br. at 10.)  Defendant effectively concedes this point in his reply when he fails to respond to the Government's clarification of the source of its knowledge.

The Government clearly discovered that Defendant retained an expert, who did not testify at trial, based on communications outside the scope of the privileged documents.  Protected information was not used at trial.  Thus, Defendant's motion for a new trial based on the Government's reference to the non-testifying expert is denied.

### J.     Defendant Was Not Deprived Of His Sixth Amendment Right To Counsel

Defendant also argues that he is entitled to a new trial because he was denied counsel of his choice.  Defendant contends that when he could no longer afford private counsel, this Court assigned Walder, Hayden & Brogan, P.A. as counsel, pursuant to the Criminal Justice Act. Defendant argues that because this Court never issued an order designating his appointed counsel, he did not have a decision or ruling from which to appeal, and was thereby denied the opportunity to elect to proceed *pro se.*

26

"Concomitant with the right to be defended by counsel during criminal proceedings is the accused's right to waive counsel and proceed *pro se*." Henderson v. Frank, 155 F.3d 159, 166 (3d Cir. 1998) (citing Faretta v. California, 422 U.S. 806, 821 (1975)). "In evaluating a district court's treatment of a defendant's request to act *pro se* at trial, . . . this Court applies a three-step analysis." United States v. Vampire Nation, 451 F.3d 189, 206 (3d Cir. 2006) (citing United States v. Peppers, 302 F.3d 120, 132 (3d Cir. 2002)). "This analysis requires that the Court (1) inquire into whether the defendant has asserted his desire to proceed pro se clearly and unequivocally; (2) inquire into whether the defendant understands 'the nature of the charges, the range of possible punishments, potential defenses, technical problems that the defendant may encounter, and any other facts important to a general understanding of the risks involved'; and (3) 'assure itself' that the defendant is competent to stand trial." Id.

Under this standard, before a court may grant a defendant leave to proceed *pro se*, the defendant must make a clear and unequivocal request to proceed without counsel. "This requirement prevents defendants from making casual and ineffective requests to proceed *pro se*, and then attempting to upset 'adverse verdicts after trials at which they had been represented by counsel.'" Buhl v. Cooksey, 233 F.3d 783, 792 (3d Cir. 2000) (quoting United States ex rel. Maldonado v. Denno, 348 F.2d 12, 16 (2d Cir. 1965)). "It also keeps defendants from proceeding pro se, then challenging any subsequent conviction by alleging a denial of the right to counsel. Requiring a clear and unequivocal assertion of the right also protects defendants from inadvertently waiving counsel based upon ''occasional musings on the benefits of self-representation.''" Buhl, 233 F.3d at 792 (quoting United States v. Frazier-El, 204 F.3d 553, 558 (4th Cir. 2000) (quoting United States v. Arlt, 41 F.3d 516, 519 (9th Cir. 1994))).

27

"A defendant need not 'recite some talismanic formula hoping to open the eyes and ears of the court to his request' to invoke his/her Sixth Amendment rights." Buhl, 233 F.3d at 792 (quoting Dorman v. Wainwright, 798 F.2d 1358, 1366 (11th Cir. 1986)). "Indeed, such a requirement would contradict the right it was designed to protect as a defendant's Sixth Amendment right of self-representation would then be conditioned upon his/her knowledge of the precise language needed to assert it." Buhl, 233 F.3d at 792. "Rather than placing such a burden on a defendant, the law simply requires an affirmative, unequivocal request, and does not require that request to be written or in the form of a formal motion filed with the court." Id. (citing United States v. Leggett, 162 F.3d 237, 249 (3d Cir. 1998); United States v. Goldberg, 67 F.3d 1092, 1099 (3d Cir. 1995)).

Here, the Defendant failed to make a clear and unequivocal request to proceed *pro se* at any time before or after pro bono counsel was appointed to represent him. In fact, Defendant affirmatively requested that this Court appoint pro bono counsel to represent him. That this Court never issued a formal order appointing pro bono counsel did not deprive Defendant of the opportunity to assert his right to proceed *pro se*. As this Court has explained, Defendant could have requested to proceed without counsel at any point in these proceedings, orally or in writing, so long as his request was clear and unequivocal. Buhl, 233 F.3d at 192. This Court cannot be expected to read Defendant's mind. Because Defendant never affirmatively requested to proceed *pro se*, he was not deprived of his Sixth Amendment right to do so. Defendant's motion for a new trial on Sixth Amendment grounds is denied.

### III.  CONCLUSION

Based on the submissions of the parties, and for the foregoing reasons, Defendant's

motion for a new trial is denied.


Date: December 8, 2006                                    _____s/Joseph A. Greenaway, Jr._____
                                                         JOSEPH A. GREENAWAY, JR., U.S.D.J.